2013 COA 36

**The PEOPLE of the State of Colorado, Plaintiff–Appellee,**

v.

**Cassandra HENSON, Defendant–appellant.**

**Court of Appeals No. 10CA0789**

Colorado Court of Appeals, Div. VI.

Announced March 28, 2013

---

John W. Suthers, Attorney General, Christine C. Brady, Senior Assistant Attorney General, Denver, Colorado, for Plaintiff–Appellee

Douglas K. Wilson, Colorado State Public Defender, Ellen K. Eggleston, Deputy State Public Defender, Denver, Colorado, for Defendant–Appellant

Opinion by Judge GABRIEL

¶ 1 Defendant, Cassandra Henson, appeals the district court's order imposing restitution in the amount of $8628.31. We affirm the award of restitution for the victim's lost wages but reverse the award of restitution for the victim's diamond ring. As to the ring, we note that no published Colorado appellate decision appears to have addressed how restitution should be calculated in factual circumstances like those present here. Decisions from courts in other jurisdictions, however, have addressed valuation issues in analogous circumstances. We are persuaded by the reasoning of those decisions, and applying that reasoning here, we conclude that

the district court erred in determining the value of the ring in its current condition, as part of its restitution calculation. We thus remand this case to the district court to allow that court to recalculate the restitution to be awarded with regard to the ring.

## I. Background

¶2 Henson stole the victim's purse, which contained, among other personal property, a 1.5 carat European cut diamond ring that had belonged to the victim's grandmother. The victim reported the theft to the police but then investigated the matter herself, after the police told her that her case "wasn't a priority."

¶3 Based on her own efforts, the victim tracked down Henson. Henson, however, had already sold the ring to a jeweler (the jeweler), and the jeweler had sent the ring to a stone cutter to remove a chip in the diamond and to change the cut of the diamond from a European cut to a different kind of cut called a "modern brilliant" cut.

¶4 Ultimately, the victim recovered the ring, but it was returned to her with the diamond in an unfinished state and approximately .2 carats smaller than it had been when it was stolen.

¶5 Henson pleaded guilty to theft, and the district court imposed a three-year deferred judgment and sentence. After a hearing, the court ordered Henson to pay a total of $8628.31 in restitution, including $2925 in lost wages and $4425.45 for the diamond ring.

¶6 Henson now appeals the restitution order.

## II. Documents Attached to the Opening Brief

¶7 As an initial matter, we note that because our review is limited to the record on appeal, we will not consider the documents attached to Henson's opening brief. *See Fendley v. People,* 107 P.3d 1122, 1125 (Colo. App.2004) ("We are limited to the record presented and may consider only arguments and assertions supported by the evidence in the record.").

## III. Restitution

¶8 On appeal, Henson argues that the court erred in imposing restitution for the victim's lost wages in the amount of $2925 and for the diamond ring in the amount of $4425.45. We are not persuaded as to the lost wages but agree as to the ring.

### A. Standard of Review and Applicable Law

¶9 We review the district court's restitution order for an abuse of discretion. *See People v. Rivera,* 250 P.3d 1272, 1274 (Colo.App.2010). A district court abuses its discretion when it misconstrues or misapplies the law. *People v. Reyes,* 166 P.3d 301, 302 (Colo.App.2007). We will not disturb the district court's determination as to the amount of restitution if it is supported by the record. *People v. Montanez,* 2012 WL 2353799, 2012 COA 101, ¶8, 300 P.3d 940.

¶10 "Restitution" is defined as "any pecuniary loss suffered by a victim and includes but is not limited to all out-of-pocket expenses ... and other losses or injuries proximately caused by an offender's conduct and that can be reasonably calculated and recompensed in money." § 18–1.3–602(3)(a), C.R.S. 2012.

¶11 The prosecution bears the burden of proving, by a preponderance of the evidence, both the amount of restitution owed and that the victim's losses were proximately caused by the defendant. *See People in Interest of K.M.,* 232 P.3d 310, 312 (Colo. App.2010) (noting that the prosecution's burden is by a preponderance of the evidence); *People v. Martinez,* 166 P.3d 223, 224 (Colo. App.2007) (noting that in a restitution proceeding, the prosecution bears the burden of proving not only the victim's losses but also that those losses were attributable to the acts of the defendant).

¶12 "Proximate cause in the context of restitution is defined as a cause which in natural and probable sequence produced the claimed injury and without which the claimed injury would not have been sustained." *Rivera,* 250 P.3d at 1274. A defendant may not be ordered to pay restitution for losses that

did not stem from the conduct that was the basis of the defendant's conviction. *Id.*

### B. Lost Wages

¶ 13 Henson argues that the district court abused its discretion in awarding restitution for the victim's lost wages based on the days that she investigated the theft of her purse, because there was no evidence that the victim had actually lost wages on those days (Henson does not otherwise challenge the award of lost wages). We disagree.

¶ 14 " '[L]ost wages' are wages not received by the victim from the date the crime was committed to the date restitution is imposed, or sooner if the victim is comparably employed prior to that date." *People v. Bryant,* 122 P.3d 1026, 1029 (Colo.App.2005).

¶ 15 Here, the court awarded restitution in the amount of $2925 for the victim's lost wages (six and one-half days at $450 per day), finding, as pertinent here, that:

- The victim did "extensive investigative work," and there was a reasonable need for the work, as confirmed by the testimony of a police detective (the detective) that the case was assigned to him because the victim had developed suspect information from which the detective could follow up.
- The victim spent six and one-half days investigating the theft, and these days represented lost time at work.
- Each day of lost work resulted in lost income of $450.
- The victim worked in an industry that provided sporadic work, so that when work was available, people in that industry worked seven days a week "at full tilt."
- The victim was paid by the days that she worked, so if she lost a day of working, she genuinely lost those wages.

¶ 16 The record supports each of these findings. Specifically, the victim testified that at the time of the theft, she did oil and gas title research and lease spire work as an independent contractor for Timberlake Management Corporation (TMC). The victim submitted a sample billing invoice that showed she billed TMC $56.25 per hour for her work, which amounted to $450 for an eight-hour day. Additionally, the victim testified that her work schedule was "seven days a week" and that when she was working on a project, she tried to work as much as she could, in case she subsequently found herself out of work for a period of time. Her schedule was flexible and her workday could range from six to fifteen hours per day.

¶ 17 The victim also testified about her extensive efforts to track down Henson and her personal property. Indeed, Henson does not dispute that the victim "spent a substantial amount of time investigating the theft." Moreover, the detective testified that the victim's investigation was "[v]ery helpful" and that he was assigned the case because the victim had developed suspect information.

¶ 18 We acknowledge that the evidence regarding the specific days and times that the victim spent investigating the case was somewhat thin and unclear. Nonetheless, the victim testified that:

- On the day of the theft, March 28, 2009, she planned to work one-half to three-quarters of a day because she was driving from Trinidad to Denver to put two rings in a safe deposit box. After her purse was stolen, however, she did not work at all, but rather spent the rest of the day looking for her purse.
- On March 29, 2009, she did not work as planned because when she called her credit card company, she learned that someone had attempted to use her credit card. As a result of this attempted use, the victim was able to obtain information about the person who tried to use the card, and she immediately followed up on this information.
- As part of her follow-up work, she used computer resources, including people search sites and social networks, to try to find the person who had used her credit card. Through these resources, she was able to identify Henson, and she also obtained a photo of Henson, her physical address, and her email address.
- In addition, the victim drove to Colorado Springs to visit pawn shops and the place where Henson had tried to use her

credit card, to see whether any of those businesses had security cameras.

- She also drove to the address in Colorado Springs that she had obtained through her online research, watched to see if she would recognize anyone from her research, and saw Henson with her purse.
- Ultimately, the victim spent three days going to pawn shops and jewelry stores trying to recover her stolen property, two days at the police station filling out forms and meeting with the detective, and one day getting the ring at issue appraised.
- In addition to the foregoing investigative work, she had to take time off from work to get a new driver's license and to close down her safe deposit box and get new safe deposit keys.

¶ 19 We conclude that the foregoing evidence sufficiently supports the district court's finding that the victim was unable to work for six and one-half days due to her investigation of and the additional activities necessitated by Henson's theft. Specifically, the record allows at least a reasonable inference that the victim was working seven days per week at the time of the theft. From such an inference, the district court could reasonably find that every day the victim spent conducting her investigation and otherwise attending to issues concerning the theft was a lost day of work for her.

¶ 20 Accordingly, we conclude that the district court did not abuse its discretion in awarding restitution in the amount of $2925 for the victim's lost wages.

### C. Diamond Ring

¶ 21 Henson next contends that the district court erred in awarding restitution in the amount of $4425.45 for the diamond ring because (1) the victim recovered and kept the stolen diamond, and (2) there was evidence that the victim's pecuniary loss was $375, based on evidence that it would have cost $200 to restore the diamond to its original European cut and $175 to repair the ring mount and to mount the diamond into the setting. Alternatively, Henson argues that the court abused its discretion in valuing the returned ring, in its altered condition, at $500.

¶ 22 We conclude that the district court properly sought to determine the amount of restitution to be awarded for the ring by (1) adding the replacement value of the diamond and the cost to repair the mount and mount the diamond, and (2) subtracting from that sum the value of the returned ring. We further conclude that the court's determinations as to the replacement value and the repair and mounting costs were amply supported by the record. We conclude, however, that the court erred in determining the value of the returned ring.

¶ 23 The value of property for purposes of restitution is determined by the victim's actual, pecuniary loss, or the amount of money that will fulfill the statutory purpose of making the victim whole to the extent practicable. *People v. Stafford*, 93 P.3d 572, 575 (Colo.App.2004). Thus, restitution for a damaged object may include repair costs, even if those costs exceed the damaged object's value. *See, e.g., People v. Smith*, 181 P.3d 324, 327 (Colo.App.2007).

¶ 24 Additionally, a court may award the reasonable replacement value of an item "when the victim demonstrates that he or she must or will replace an item that is not readily replaceable at a fair market value cost." *Stafford*, 93 P.3d at 575–76 (holding that, when the victim was obliged either to replace five stolen and unrecovered computers under a lease arrangement or to buy out the leases, the victim had adequately demonstrated that it had to replace the computers and that the replacement value would be dictated by the leases rather than fair market value, given the absence of a "broad and active market" for used computers like those that were stolen).

¶ 25 Here, we perceive no error in the district court's decision to begin with the diamond's replacement value. It appears undisputed that the returned diamond was .2 carats smaller than it was when it was stolen and that that diamond could not be returned to its original size. Accordingly, it would not have sufficed merely to restore the diamond to its original European cut and then to remount the diamond into its original setting, as Henson asserts should have been done.

¶ 26 Moreover, the evidence showed that the victim intended to replace the ring and that the ring was not readily replaceable at fair market cost. As pertinent here, the victim testified that she had had difficulty finding a European cut diamond, although Trice Jewelers, with some effort, eventually found one at an estate sale. Likewise, although the jeweler testified that there was a "fairly good chance" that one could find a replacement European cut diamond with about the same color and clarity as the victim's diamond, he added that "[i]t might take a while to find it."

¶ 27 On these facts, we perceive no error in the district court's decision to begin its analysis with the reasonable replacement value of the diamond. *See Stafford,* 93 P.3d at 575–76.

¶ 28 We further conclude that there is ample evidence in the record to support the district court's findings that the cost of the replacement diamond was $4750.45 and the cost to fix the ring mount and to mount the new diamond was $175. Specifically, the jeweler testified that a replacement diamond would cost a buyer $4500 to $5000, and an invoice from Trice Jewelers showed that the cost of a comparable diamond that Trice had found and put on layaway for the victim was $4750.45. Moreover, the jeweler testified that the cost of repairing the mount and mounting the diamond would be about $150 to $175.

¶ 29 We conclude, however, that the evidence does not support the district court's finding that the value of the returned ring, which the victim decided to keep, was $500. The court appears to have based this finding on the fact that the jeweler paid Henson $500 for the ring. For two reasons, however, that transaction does not support a conclusion that $500 is the value of the ring in its current condition.

¶ 30 First, it is undisputed that after purchasing the ring, the jeweler had it delivered to a stone cutter who repaired a chip in the diamond but also reduced the diamond's size by .2 carats. Thus, the ring was in a different condition when the victim recovered it than when the jeweler bought it.

¶ 31 Second, the record reflects that the amount paid by the jeweler did not reflect the ring's fair market value. Published Colorado appellate decisions have indicated that "fair market value" refers to the price that would be agreed on by a willing seller and a willing buyer under no compulsion to sell or buy. *See, e.g., In re Estate of Beren,* 2012 WL 5871034, 2012 COA 203, ¶ 46. Other jurisdictions have defined "fair market value" as the price at which a willing buyer and willing seller *with knowledge of all of the relevant facts* would agree to exchange the property or interest at issue. *See, e.g., United States v. Butler,* 694 F.3d 1177, 1181 (10th Cir.2012).

¶ 32 Here, because Henson was a thief, it is unclear to us that she was under no compulsion to sell. *See Mercado v. Sheriff,* 94 Nev. 771, 587 P.2d 1327, 1329 (1978) ("[A] thief may often be compelled to sell stolen property at far below its market rate."); *accord Boone v. Stacy,* 597 F.Supp. 114, 117 (E.D.Va.1984). Moreover, the jeweler testified that although the ring was worth $1500 to $2000 wholesale and $2500 to $3000 retail when he bought it (which was consistent with a Trice Jewelers appraisal valuing the ring in its current condition at $2250), he offered only $500 because that was what he could afford at the time. Such evidence suggests that Henson, in fact, sold the ring for a price well below its market value. In addition, the record reflects that the jeweler at all times intended to resell the ring. Thus, the jeweler had an incentive to purchase the ring for as far below market value as possible, in order to maximize his profit when he resold the ring. *See Tedesco v. Montclair Twp.,* 21 N.J.Tax 95, 99 (N.J.Super.Ct.App.Div.2003) (holding that the tax court did not err in finding that a taxpayer's purchase price did not represent the fair market value of the subject property, where a bank, which was principally concerned with recouping money on a defaulted loan, sold the property to the taxpayer soon after purchasing it at a sheriff's sale, and where the taxpayer acknowledged that he often purchased properties at below market prices in the hope of selling them for a profit). Finally, there is no indication in the record that the jeweler knew all of the relevant facts, including the critical

fact that the ring was stolen. Had he known this fact, he may not have been willing to purchase the ring at all.

¶ 33 Accordingly, we conclude that the record does not support the district court's finding that the returned ring, in its current condition, was worth $500.

¶ 34 In so holding, we acknowledge cases like *People v. McCoy*, 764 P.2d 1171, 1175–76 (Colo.1988), in which our supreme court has held that, in theft by receiving cases, evidence of the amount paid for stolen goods (i.e., the "stolen goods market" value) is alone sufficient to demonstrate value, even when a legitimate market existed for the stolen goods. Such cases, however, are inapposite in restitution cases like the present one, where the goal is to determine the victim's actual, pecuniary loss and to make him or her whole to the extent practicable. *Stafford*, 93 P.3d at 575.

¶ 35 We thus reverse that portion of the district court's order awarding restitution for the ring, and we remand this case to that court with instructions that the court reconsider the amount of such restitution.

## IV.   Remand Instructions

¶ 36 In reconsidering the amount of the restitution to be awarded with regard to the ring, the district court should again begin with the sum of $4750.45 (the value of the replacement diamond) and $175 (reflecting the cost to repair the mount and to mount the new stone). The court should then subtract from that sum the recalculated value of the returned ring. For purposes of this recalculation, we note that there is already some evidence in the record concerning the value of the returned ring. Specifically, the appraisal from Trice Jewelers showed that the altered diamond had a value of $2000, and the jeweler testified that the altered diamond was worth $2000 wholesale and $4000 retail. We leave to the district court's discretion whether to allow the parties to introduce additional evidence on this issue, or whether to make the required recalculation on the basis of evidence already in the record.

## V.   Conclusion

¶ 37 For these reasons, the portion of the order awarding $4425.45 in restitution for the diamond ring is reversed, and the case is remanded for purposes of allowing the district court to recalculate that award pursuant to the instructions set forth above. In all other respects, the order is affirmed.

Judge LOEB and Judge DUNN concur.