COLORADO COURT OF APPEALS 2016COA106

Court of Appeals No. 14CA1954
El Paso County District Court No. 12CR3669
Honorable Thomas L. Kennedy, Judge

The People of the State of Colorado,

Plaintiff-Appellee,

v.

John Arthur Stellabotte,

Defendant-Appellant.

JUDGMENT AFFIRMED, SENTENCES AFFIRMED IN PART,
VACATED IN PART, AND CASE REMANDED WITH DIRECTIONS

Division I
Opinion by JUDGE TAUBMAN
Freyre, J., concurs
Dailey, J., concurs in part and dissents in part

Announced July 14, 2016

Cynthia H. Coffman, Attorney General, Patricia R. Van Horn, Senior Assistant
Attorney General, Matthew S. Holman, First Assistant Attorney General,
Denver, Colorado, for Plaintiff-Appellee

Lynn C. Hartfield, Alternate Defense Counsel, Denver, Colorado, for Defendant-
Appellant

¶ 1    Defendant, John Arthur Stellabotte, appeals the judgment of conviction entered after a jury verdict finding him guilty of one count of aggravated motor vehicle theft, two counts of felony theft, and one count of misdemeanor theft. He also appeals his sentence, as enhanced by three habitual criminal counts. We affirm the conviction, vacate the sentences for felony theft, affirm the other sentences, and remand for resentencing on the felony theft convictions.

## I.    Background

¶ 2    Stellabotte, owner of J&J Towing, was charged with six counts of first degree aggravated motor vehicle theft, under section 18-4-409(2) and (3)(a), C.R.S. 2015; four counts of theft, under section 18-4-401(1), C.R.S. 2015; and five habitual criminal counts pursuant to section 18-1.3-801, C.R.S. 2015. The counts related to J&J towing five vehicles. A jury convicted Stellabotte of one count of aggravated motor vehicle theft, a class 4 felony; two counts of theft, class 4 felonies; and one count of theft, a class 2 misdemeanor relating to two tows — the B.W. and P.H. tows.

1

## A.    The B.W. Tow

¶ 3    In June 2012, B.W. parked her car at an apartment complex. The following morning, her car was missing.  A sign in the parking lot stated that cars without parking permits would be towed by J&J Towing.  B.W., whose car did not have a parking permit sticker, called J&J to recover her car, but the company stated that it did not have it.  B.W. reported her car stolen.

¶ 4    Five days later, J&J towed the car to a police station. Stellabotte said that J&J had notified the police of the initial tow on June 8, as required by state towing regulations.  The officer, however, could not find such a notification.

¶ 5    J&J initially requested that B.W. pay $215 to release her car but eventually returned it to her without her making any payment. However, several days later, Stellabotte told B.W. that he would put a lien on her car and tow it again if she did not pay him the money. The next day, he towed B.W.'s car, which was parked on a public street across from her house.  Stellabotte refused to release the car to B.W. until she paid him $498.50, which she did.  She noticed damage to her car, and Stellabotte said if she did not sign a release form he would charge her another $200, so she signed the form.

¶ 6      Teresa Hill, the apartment complex property manager, testified that rules in place for the property required license plate stickers indicating that any parked car belonged to a resident.[1]  As manager, she entered into a contract with J&J, through an employee named James Ward.[2]  The complex permitted J&J to tow cars without the proper stickers without first contacting management at the apartment complex.

¶ 7      B.W. reported J&J to the Colorado Public Utilities Commission (PUC).

### B.    The P.H. Tow

¶ 8      In July 2012, K.S. parked a truck, registered to her father, P.H., in the parking lot of a shopping mall, where she worked at a yogurt shop.  She arranged for P.H. to pick up the truck the following day, but when he arrived to pick up the truck, it was missing.

---

[1] Visitors were required to park on the street.
[2] Although he denied being a partner at J&J, Ward testified that when he signed documents on behalf of J&J, he designated himself as an owner.  One of J&J's drivers testified that Ward hired employees, obtained the majority of the towing contracts, and was in charge of day-to-day operations.

¶ 9 K.S.'s mother, R.H., and P.H. contacted Griffis-Blessing, the company they believed to be the property manager for the mall. Griffis-Blessing could not provide them with any information about whether the truck had been towed, but the family later received an unsigned letter from J&J, which advised them that J&J had towed the truck. At the time the truck was towed, its registration had expired. P.H. paid $583 to retrieve the truck.

¶ 10 R.H. requested a refund from J&J after Griffis-Blessing advised her that it had not authorized the tow. However, Ward advised her that she could only claim her refund if she signed a letter of final settlement, stating that the refund settled all outstanding amounts and that R.H. would "not slander or speak of this matter to any partys [sic] outside of this matter," including the PUC. When she refused to sign the acknowledgment, Ward called Stellabotte, who reiterated that if R.H. refused to sign the agreement, he would not give her a refund.

¶ 11 Kelly Clay, a property manager who worked for Griffis-Blessing, testified that she was unaware of any towing contract with J&J for the portion of the shopping mall that she managed and that she had not authorized the tow of P.H.'s truck. She stated that a

4

different property management company managed the property where the yogurt shop was located.[3]

### C. PUC Investigation & Trial

¶ 12 Following B.W.'s complaint, Anthony Cummings, an investigator with the PUC, spoke with Ward, who provided towing invoices for both B.W. tows. Cummings determined that the documents did not comply with PUC regulations. Specifically, the invoices lacked authorizing signatures, a release date, and a specific rate statement, and they contained an incorrect address for the business. According to Cummings, these deficiencies rendered the towing contracts invalid and meant that J&J was not authorized to collect the $493 that B.W. had paid to have her car released.

¶ 13 Cummings found similar PUC violations regarding P.H.'s tow. Ward was unable to provide a written towing contract for the shopping mall property. Ward claimed that "S.R.," which stood for Sean Reilly, had authorized the tow because his initials appeared on the towing invoice. Reilly, the former leasing agent for the

_____

[3] At trial, no evidence indicated who managed the property where the yogurt shop was located, but Stellabotte does not raise this as an issue on appeal.

5

shopping mall, testified that his responsibilities did not include authorizing tows from the property. He denied authorizing the tow of the truck.

¶ 14    On August 22, 2014, after a trial and jury verdict, the court adjudicated Stellabotte a habitual criminal for convictions on three counts — a 2005 aggravated motor vehicle theft, a 2003 attempted aggravated motor vehicle theft, and felony menacing in 1996.

¶ 15    In accordance with the habitual criminal statute, the court quadrupled the maximum sentencing ranges of the felony convictions, resulting in twenty-four-year sentences for each of the three felony convictions. The court sentenced Stellabotte to one year for the misdemeanor theft conviction. The sentences all ran concurrently.

¶ 16    Stellabotte raises four contentions on appeal: (1) the trial court erred in instructing the jury on aggravated motor vehicle theft; (2) the court erred in providing the jury with a dictionary definition of the term "authorization"; (3) the twenty-four-year sentences imposed for Stellabotte's two felony theft convictions should be halved because of new legislation reducing the severity of those offenses; and (4) the twenty-four-year sentences imposed for

Stellabotte's three habitual criminal counts are grossly disproportionate to the nature and severity of the offenses. We agree with Stellabotte's third contention that he should benefit from the General Assembly's amendatory legislation to reduce the severity of felony theft offenses. However, we disagree with his other contentions.

## II. Jury Instruction

¶ 17 Stellabotte contends that the trial court erred in instructing the jury on aggravated motor vehicle theft, where, in contrast to the theft instruction, the aggravated motor vehicle theft instruction did not convey that he had to act knowingly without authorization. We disagree.

### A. Standard of Review

¶ 18 We apply a two-tier standard of review to jury instructions. First, we review de novo the jury instructions as a whole to determine whether the instructions accurately informed the jury of the governing law. *People v. Lucas*, 232 P.3d 155, 162 (Colo. App. 2009). Second, if the trial court correctly informed the jury of the governing law, we review the court's formulation of the instructions for an abuse of discretion. *People v. Pahl*, 169 P.3d 169, 183 (Colo.

7

App. 2006). A court abuses its discretion when its ruling is manifestly arbitrary, unreasonable, or unfair, *People v. Rath*, 44 P.3d 1033, 1043 (Colo. 2002), and when it misconstrues or misapplies the law, *People v. Henson*, 2013 COA 36, ¶ 9, 307 P.3d 1135, 1136.

## B. Applicable Law

¶ 19 Under section 18-4-409(2), a person commits first degree aggravated motor vehicle theft "if he or she knowingly obtains or exercises control over the motor vehicle of another without authorization or by threat or deception."

¶ 20 The culpable mental state, "knowingly," applies not only to a defendant's exercise of control over the vehicle, but also to his or her awareness of lack of authority. *People v. Bornman*, 953 P.2d 952, 954 (Colo. App. 1997). When a mental state is listed as a stand-alone element, it applies to the succeeding elements. *See People v. Chase*, 2013 COA 27, ¶ 62, ___ P.3d ___, ___ ("Knowingly" is set out "as a standalone element, thereby indicating that it applied to all of the subsequent elements of the offense."); *People v. Stephens*, 837 P.2d 231, 234 (Colo. App. 1992) (stating that

"knowingly," listed as separate element, applied to succeeding elements, including the "without authorization" element).

### C. Analysis

¶ 21 The court instructed the jury that the elements of first degree aggravated motor vehicle theft were that Stellabotte:

> 1. In the State of Colorado, at or about the date and place charged,
>
> 2. knowingly,
>
> 3. obtained and exercised control over the motor vehicle,
>
> 4. belonging to another person,
>
> 5. without authorization, and
>
> 6. the value of the motor vehicle involved is twenty thousand dollars or less, and
>
> 7. the defendant,
>
> 8. had possession and control over the motor vehicle for more than twenty-four (24) hours.

¶ 22 The court listed "knowingly" as the second element and listed "without authorization" as the fifth element. We conclude that the trial court did not err in instructing the jury on aggravated motor vehicle theft because the court listed the culpable mental state, "knowingly," as a separate element. Therefore, "knowingly" applied

9

to the succeeding elements, including "without authorization," and thus the instruction indicated that Stellabotte had to have known that possession of the automobile was without authorization.

¶ 23     Stellabotte next argues that when the jury read the theft and aggravated motor vehicle theft instructions together, it reasonably would have believed that the two offenses had different standards of proof because the theft instruction explicitly tied the "without authorization" element to the "knowingly" element, but the aggravated motor vehicle theft instruction did not.  The court instructed the jury that the elements of theft were:

> 1.  That the defendant,
>
> 2.  in the State of Colorado, at or about the date and place charged,
>
> 3.  knowingly
>
> a.  obtained or exercised control over
>
> b.  anything of value
>
> c.  which was the property of another person,
>
> d.  without authorization . . . .

¶ 24     We conclude that the court properly instructed the jury as to the elements of theft.  In the theft instruction, the court listed "without authorization" as a lettered subpart of the numbered

"knowingly" element. Albeit in a different manner, this instruction also conveyed that Stellabotte had to have known that he obtained or exercised control of the automobile without authorization.

¶ 25     While we agree with Stellabotte that "it is error for a court to instruct the jury in a manner that invites confusion," *Steward Software Co. v. Kopcho*, 275 P.3d 702, 711 (Colo. App. 2010), *rev'd on other grounds*, 266 P.3d 1085 (Colo. 2011), we disagree that the two instructions, when read together, created confusion. In both instructions, the court set off the "knowingly" element. Although the court set off "knowingly" in different ways — in the aggravated motor vehicle theft instruction, as a separate numbered element, and in the theft instruction, as a heading for several elements, including "without authorization" — we nevertheless conclude that because both instructions were correct, the court did not err, even when we consider the two instructions together.

¶ 26     Stellabotte relies on *Bornman* to argue that the instructions created confusion. In *Bornman*, 953 P.2d at 954, the instruction for theft did not properly advise the jury that the defendant had to be aware that his possession of a vehicle was unauthorized. The instruction read:

1. That the defendant

2. In the state of Colorado at or about the date and place charged,

3. knowingly

    a. obtained or exercised control over

    b. anything of value,

    c. which was the property of another person,

4. without authorization . . . .

*Id.* at 953. *Bornman* is distinguishable. There, the trial court erred because the instruction did not explicitly require a finding that the defendant knew that his possession or control of the item was without authorization of the owner. The *Bornman* court added subparts to the third element and did not include "without authorization" as a subpart, but rather listed it as a separate element. Here, as discussed above, in the aggravated motor vehicle theft instruction, the court listed "knowingly" as a separate element, with no subparts, so "knowingly" applied to all succeeding elements, including "without authorization." In contrast, in the theft instruction, the court listed "without authorization" as a subpart of the "knowingly" element, so "knowingly" applied to the

12

"without authorization" element. Therefore, we conclude that the trial court did not err in accurately informing the jury of the governing law, and it did not abuse its discretion in formulating the jury instructions.

## III.    Definition of Authorization

¶ 27    During deliberation, the jury asked for a definition of the term "authorization," and the court used a "standard dictionary definition" to instruct the jury that the term "authorization" meant "to provide someone with legal authority to perform an act."

¶ 28    Stellabotte contends that the court abused its discretion when it provided this definition because the definition differed from that in relevant case law. While we agree that the court provided a definition that differed from that found in case law, we conclude that the court did not abuse its discretion.

### A.    Standard of Review

¶ 29    We apply the same standard of review as in Part II.A.

### B.    Applicable Law

¶ 30    Absent evidence to the contrary, a jury is presumed to understand and follow the trial court's instructions. *Leonardo v. People*, 728 P.2d 1252, 1255 (Colo. 1986). This presumption may

be overcome "when the jury indicates to the judge that it does not understand an element of the offense charged or some other matter of law central to the guilt or innocence of the accused." *Id.* at 1256. On receipt of a jury's question regarding a point of law, a court should give further instructions to the jury unless the question can be answered by the instructions already given, the question is not relevant to the law at issue, or the question asks the court to decide issues of fact. *Chase*, ¶ 38, ___ P.3d at ___.

¶ 31    "When a term, word, or phrase in a jury instruction is one with which reasonable persons of common intelligence would be familiar, and its meaning is not so technical or mysterious as to create confusion in jurors' minds as to its meaning, an instruction defining it is not required." *People v. Thoro Prods. Co.*, 45 P.3d 737, 745 (Colo. App. 2001), *aff'd*, 70 P.3d 1188 (Colo. 2003). However, Colorado's appellate courts have consistently upheld courts giving the jury supplemental instructions, even when unnecessary, if the instructions properly state the law. *People v. Holwuttle*, 155 P.3d 447, 449-50 (Colo. App. 2006).

## C.    Analysis

¶ 32    There is no statutory definition of the term "without authorization" or "authorization."  Thus, the court did not abuse its discretion in supplementing the jury instructions because "authorization" was related to a legal issue, the court's response was simple and direct, and the jury expressed confusion over the term's meaning.  *See People v. Cruz*, 923 P.2d 311, 313 (Colo. App. 1996) (holding that court did not err in giving the jury a dictionary definition of an undefined element of a crime); *see also People v. Martin*, 851 P.2d 186, 189 (Colo. App. 1992).

¶ 33    Divisions of our court have defined "without authorization" in the context of theft statutes to mean "that the owner of the property, or a person in possession of the property with the owner's consent, has not given the actor permission to exercise control over the property."  *People v. McCormick*, 784 P.2d 808, 810 (Colo. App. 1989) (quoting *People v. Edmonds*, 195 Colo. 358, 362, 578 P.2d 655, 659 (1978)); *see People v. Stell*, 2013 COA 149, ¶ 14, 320 P.3d 382, 385 ("A person acts 'without authorization' when the owner of the property has not given him or her permission to obtain or exercise control over the property.").

¶ 34    Generally, the use of an excerpt from an opinion in a jury instruction is an unwise practice because opinions and instructions have different purposes. *Pahl*, 169 P.3d at 183-84. Thus, the court was not required to use the definition of "authorization" or "without authorization" from our published decisions.

¶ 35    Further, we conclude that the court acted within its discretion when it tailored the wording of its response to the jury's question because the court's definition of "authorization" was a proper definition that fit the facts of the case and related to the issues the jury needed to resolve. Therefore, trial court did not abuse its discretion when it supplied the jury with its definition of authorization.

¶ 36    Stellabotte argues that by defining the term "authorization" to require "legal authority," the court injected a requirement that the authority to act derive from a law. We disagree. "[T]erms frequently have more than one ordinary meaning, or at least more than one shading or nuance of meaning . . . ." *Marquez v. People*, 2013 CO 58, ¶ 8, 311 P.3d 265, 268. We conclude that the court did not inject a new requirement that lowered the prosecution's burden of proof. Rather, the court chose a definition different from that in our

published decisions that was appropriate in the circumstances of this case.

¶ 37    Therefore, we conclude that the court did not abuse its discretion when it provided the jury with the dictionary definition of "authorization."

## IV.    Effect of Amendatory Legislation

¶ 38    On June 5, 2013, the General Assembly lowered the classification of thefts of items valued between $5000 and $20,000 from class 4 to class 5 felonies.  *See* Ch. 373, sec. 1, § 18-4-401, 2013 Colo. Sess. Laws 2196.  The General Assembly did not include a specific effective date of the amendment.

¶ 39    Stellabotte committed his offenses in June and July 2012. The jury entered its verdict in May 2014, and the court sentenced Stellabotte in August 2014.  Consequently, by the time the court sentenced Stellabotte, his offenses were considered class 5 felonies. However, the court entered a judgment of conviction and sentenced him under the prior laws as class 4 felonies.

¶ 40    Stellabotte contends that the reclassification should reduce the maximum of his sentencing range for his theft convictions from six years to three years, which in turn should reduce his sentence

17

for those offenses, as enhanced by the habitual criminal statute, from twenty-four years to twelve years. We agree.

## A. Standard of Review

¶ 41 We review de novo the legality of a sentence. *People v. Hard*, 2014 COA 132, ¶ 46, 342 P.3d 572, 581.

¶ 42 Because Stellabotte did not raise this argument before the trial court, the People contend that we must review any error for plain error. *See Hagos v. People*, 2012 CO 63, ¶¶ 18-19, 288 P.3d 116, 120-21. However, we need not review for plain error because a defendant may raise a claim at any time that his or her sentence was not authorized by law. *People v. Fransua*, 2016 COA 79, ¶ 17, ___ P.3d ___, ___.

## B. Applicable Law

¶ 43 In determining whether to apply amendments to legislation, we first look to the plain language of the statute. *People v. Summers*, 208 P.3d 251, 253-54 (Colo. 2009). Statutes that explicitly state that they are to apply only to offenses committed after the effective date are to be applied accordingly. *See People v. McCoy*, 764 P.2d 1171, 1174 (Colo. 1988).

¶ 44    "A statute is presumed to be prospective in its operation." § 2-4-202, C.R.S. 2015.  However, where the legislative intent is silent, a defendant may seek retroactive application of a statute if he or she benefits from a significant change in the law.  § 18-1-410(1)(f)(I), C.R.S. 2015.  The supreme court extended this rule to defendants seeking relief on direct appeal.  *People v. Thornton*, 187 Colo. 202, 203, 529 P.2d 628, 628 (1974); *see also People v. Russell*, 2014 COA 21M, ¶ 12, ___ P.3d ___, ___ (*cert. granted* Feb. 23, 2015).  Whenever constitutionally possible, a defendant should be granted the benefits of amendatory legislation that mitigates the penalty for a crime.  *People v. Bloom*, 195 Colo. 246, 251, 577 P.2d 288, 292 (1978).

## C.    Analysis

¶ 45    The theft amendment is silent as to whether it applies retroactively or prospectively, and the legislative history provides no guidance as to its application.  However, several divisions of our court have considered whether amendments that are silent as to their effective dates apply retroactively.  *See People v. Boyd*, 2015 COA 109, ¶ 14, ___ P.3d ___, ___ (concluding that although Amendment 64 does not indicate a clear intent for retroactive

application, it applied retroactively to the defendant's conviction for possession of marijuana) (*cert. granted* Mar. 21, 2016); *Russell,* ¶ 13, ___ P.3d at ___ (same); *People v. Palmer,* 42 Colo. App. 460, 461-63, 595 P.2d 1060, 1062-63 (1979); *People v. Jenkins,* 40 Colo. App. 140, 143, 575 P.3d 13, 15-16 (1977); *see also Bloom,* 195 Colo. at 251-52, 577 P.2d at 292; *Thornton,* 187 Colo. at 203, 529 P.2d at 628-29; *People v. Thomas,* 185 Colo. 395, 397-98, 525 P.2d 1136, 1138 (1974).  We follow the legal analysis presented in the above-cited decisions and apply them to the theft statutory amendment.  We conclude that the theft amendment applies retroactively to cases pending in the trial court when the amendment was enacted.

¶ 46     In addition, both *Boyd* and *Russell,* although they dealt with constitutional amendments, relied on section 18-1-410(1)(f)(I). Section 18-1-410(1)(f)(I) expressly applies to statutory amendments. Thus, we find the analysis in *Boyd* and *Russell* particularly persuasive here where a statutory amendment is at issue.

¶ 47     The partial dissent relies on *Riley v. People,* 828 P.2d 254, 258 (Colo. 1992); *McCoy,* 764 P.2d at 1174; and *People v. Macias,* 631 P.2d 584, 587 (Colo. 1981), for the proposition that a defendant

should not receive the benefit of legislation that lessens the penalties for crimes committed before the legislation was enacted unless the General Assembly clearly intended the legislation to be applied retroactively. These cases are distinguishable. In *Riley, McCoy*, and *Macias*, the supreme court considered cases where the General Assembly provided that the statutory amendments applied to offenses committed on or after the effective date. *See also People v. Pineda-Eriza*, 49 P.3d 329, 333 (Colo. App. 2001). Thus, the statements on which the dissent relies are dicta. *Boyd*, ¶ 29, ___ P.3d at ___.[4] Further, because the three cases dealt with amendatory statutes that applied only to offenses committed on or after the effective date, we do not view *Riley, McCoy*, and *Macias* as inconsistent with *Russell* and *Boyd*. Rather, the former apply to

---

[4] We recognize that apparent conflict between section 2-4-202, C.R.S. 2015, and section 18-1-410, C.R.S. 2015. Applying rules of statutory construction, the *Boyd* majority concluded that section 18-1-410 should prevail over section 2-4-202 because the propositions in *Riley v. People*, 828 P.2d 254, 258 (Colo. 1992), and *People v. McCoy*, 764 P.2d 1171, 1174 (Colo. 1988), on which the dissent relied constituted dicta and section 18-1-410 is the more specific statutory provision. *People v. Boyd*, 2015 COA 109, ¶¶ 28-32, ___ P.3d ___, ___ (*cert. granted* Mar. 21, 2016). The *Boyd* majority ultimately resolved the conflict between section 2-4-202 and section 18-1-410 by reading section 18-1-410 as an exception to section 2-4-202. We agree with that analysis.

legislative amendments with prospective effective dates, and the latter apply to legislative amendments, as here, with an effective date, but no indication whether they were to be applied prospectively or retroactively.

¶ 48    Therefore, we vacate and remand to the trial court to correct his sentence on the two felony theft convictions and corresponding habitual criminal sentence enhancement to reflect a twelve-year sentence for those offenses.  We emphasize that our analysis only applies to the felony theft convictions, and not the aggravated motor vehicle theft and misdemeanor theft convictions.

## V.    Proportionality Review

¶ 49    Stellabotte contends that the twenty-four-year sentences that the trial court imposed are disproportionate to the nature and severity of his offenses in violation of the Eighth Amendment.  We disagree.

### A.    Standard of Review

¶ 50    We review de novo whether a sentence is constitutionally proportionate.  *People v. Hargrove*, 2013 COA 165, ¶ 8, 338 P.3d 413, 416.

22

## B. Applicable Law

¶ 51 The Eighth Amendment to the United States Constitution prohibits the imposition of sentences that are disproportionate to the crime committed. *Solem v. Helm*, 463 U.S. 277, 284 (1983). Although reviewing courts should grant substantial deference to the legislature's authority to set penalty schemes, "no penalty is *per se* constitutional." *Id.* at 290.

¶ 52 "In the absence of a need for a refined analysis inquiring into the details of the specific offenses or a detailed comparison of sentences imposed for other crimes in this or other jurisdictions, an appellate court is as well positioned . . . to conduct a proportionality review." *People v. Gaskins*, 825 P.2d 30, 37-38 (Colo. 1992).

¶ 53 Upon request, a defendant is entitled to an abbreviated proportionality review of his or her sentence. *People v. Deroulet*, 48 P.3d 520, 526 (Colo. 2002). An abbreviated proportionality review consists of a comparison of the gravity of the offense and the harshness of the penalty to discern whether it raises an inference of gross disproportionality. *Id.* at 527.

¶ 54 For purposes of proportionality review, we consider each sentence imposed separately. *Close v. People*, 48 P.3d 528, 539

(Colo. 2002). We scrutinize all the offenses in question, both triggering and predicate, to determine whether in combination they are so lacking in gravity or seriousness as to suggest that a sentence enhanced by the habitual criminal sentence is grossly disproportionate. *People v. Patnode*, 126 P.3d 249, 260 (Colo. App. 2005). If an abbreviated review does not yield an inference of gross disproportionality, no further review is required. *People v. Reese*, 155 P.3d 477, 479 (Colo. App. 2006). "[I]n almost every case, the abbreviated proportionality review will result in a finding that the sentence is constitutionally proportionate, thereby preserving the primacy of the General Assembly in crafting sentencing schemes." *Deroulet*, 48 P.3d at 526.

¶ 55    When a court considers the gravity of the offense in an abbreviated proportionality review, it must determine whether the offense is grave and serious. *People v. Strock*, 252 P.3d 1148, 1158 (Colo. App. 2010). In making the determination, courts consider the harm caused or threatened to the victim or to society and the culpability of the offender. *Gaskins*, 825 P.2d at 36.

¶ 56    Certain felonies are per se grave and serious crimes for purposes of proportionality review. *Close*, 48 P.3d at 538. If a

reviewing court is unable to conclude that a certain felony is categorically grave and serious on its face, the court may conduct a more refined inquiry into the case-specific facts and circumstances underlying the offense and determine if the offense is grave and serious. *People v. Mershon*, 874 P.2d 1025, 1032 (Colo. 1994).

### C.    Analysis

¶ 57     Stellabotte contends all three of his twenty-four-year sentences are disproportionate to the nature and severity of the offenses. We disagree.

¶ 58     Stellabotte's triggering offenses — two counts of felony theft and one count of aggravated motor vehicle theft — either individually or in combination, are grave and serious crimes for the purposes of an abbreviated proportionality review. *See People v. Cooper*, 205 P.3d 475, 481 (Colo. App. 2008) (even assuming that triggering and predicate car theft offenses were not individually grave and serious per se, in combination they were grave and serious); *People v. Merchant*, 983 P.2d 108, 117 (Colo. App. 1999) (felony theft is a serious offense); *People v. Penrod*, 892 P.2d 383, 387 (Colo. App. 1994) (aggravated motor vehicle theft "may not be characterized as lacking in gravity").

¶ 59 Likewise, Stellabotte's underlying offenses — attempted aggravated motor vehicle theft, aggravated motor vehicle theft, and felony menacing — are also grave and serious. *People v. Cisneros*, 855 P.2d 822, 830 (Colo. 1993) (felony menacing is a grave and serious offense). These prior felonies triggered habitual criminal sentencing, which quadrupled his sentence.

¶ 60 Accordingly, Stellabotte's triggering offenses and the three predicate offenses are sufficiently grave and serious to support a conclusion that his twenty-four-year concurrent sentences are constitutionally proportionate, particularly in light of the mandatory habitual criminal sentence enhancement. Given our conclusion in Part V, it follows that Stellabotte's new theft sentences of twelve years also are not grossly disproportionate.

## VI.   Conclusion

¶ 61 The judgment of conviction is affirmed, the felony theft sentences are vacated, the other sentences are affirmed, and the case is remanded for resentencing on the felony theft convictions.

JUDGE FREYRE concurs.

JUDGE DAILEY concurs in part and dissents in part.

JUDGE DAILEY, concurring in part and dissenting in part.

¶ 62 I agree with all but Part IV of the majority opinion. Contrary to the majority, I would decline to follow *People v. Russell*, 2014 COA 21M (*cert. granted* Feb. 23, 2015), and *People v. Boyd*, 2015 COA 109 (*cert. granted* Mar. 21, 2016), and, thus, I would uphold the class 4 felony classification of defendant's convictions for theft.

¶ 63 Defendant's convictions were based on acts committed in the summer of 2012. As noted by the majority, the General Assembly did not amend the law, lowering the classification of defendant's criminal acts, until June 2013.

¶ 64 The issue is whether the 2013 legislation applies retroactively to lower the felony classification for acts committed nearly a year earlier. Relying on *Russell* and *Boyd*, the majority holds that it does. Both *Russell* and *Boyd* addressed the retroactivity of an amendment to the state constitution which decriminalized certain theretofore illegal offenses related to marijuana use. In *Russell,* the division said:

> In general, when construing a constitutional amendment, unless its terms clearly show intent that the amendment be retroactively applied, "we presume the amendment has prospective application only."

27

> . . . The general presumption of prospective application, however, is subject to a doctrine established by our General Assembly and supreme court enabling a defendant to benefit retroactively from a significant change in the law.

*Russell*, ¶¶ 11-12 (citations omitted) (quoting *Huber v. Colo. Mining Ass'n*, 264 P.3d 884, 889 (Colo. 2011)).

¶ 65    The "doctrine" the *Russell* division identified as the exception to the general rule of prospective application originated in a line of supreme court cases holding that a defendant whose conviction is not yet final is entitled to the benefit of amendatory legislation mitigating the penalties for crimes. *See People v. Thomas*, 185 Colo. 395, 397-98, 525 P.2d 1136, 1138 (1974); *see also People v. Bloom*, 195 Colo. 246, 251-52, 577 P.2d 288, 292 (1978); *People v. Thornton*, 187 Colo. 202, 203, 529 P.2d 628, 628-29 (1974).

¶ 66    However, a subsequent, and inconsistent, line of supreme court cases states that a defendant should not receive the benefit of legislation that lessens the penalties for crimes committed before the new legislation was enacted unless the legislation was clearly intended to be applied retroactively. *See Riley v. People*, 828 P.2d

254, 258 (Colo. 1992); *People v. McCoy*, 764 P.2d 1171, 1174 (Colo. 1988); *People v. Macias*, 631 P.2d 584, 587 (Colo. 1981).

¶ 67 The majority finds this second line of authority inapposite because, although there is no clear indication of an intent to apply the new legislation retroactively, there is also no clear indication of intent to apply it only prospectively to acts committed on or after a certain date.

¶ 68 I do not believe that this second — and, in my view, controlling — line of authority can be so easily dismissed. It is premised on the rule of construction that presumes a statute is "prospective in its operation." § 2-4-202, C.R.S. 2015. "The General Assembly may override this presumption by clearly expressing a contrary intent." *People v. Summers*, 208 P.3d 251, 256 (Colo. 2009); *see Riley*, 828 P.2d at 257 ("Legislation is presumed to have prospective effect unless a contrary intent is expressed by the General Assembly."); *see also McCoy*, 764 P.2d at 1174 ("Our cases also establish that a defendant does not receive any ameliorative benefit when retroactive application of the amendatory legislation is clearly not intended by its own terms."); *People v. Pineda-Eriza*, 49 P.3d 329, 333 (Colo. App. 2001) ("A defendant is not entitled to the ameliorative effects of

29

amendatory legislation if the legislature has not indicated its intent to require retroactive application thereof.").

¶ 69 Contrary to the majority's belief, the absence of an explicit prospective application provision cannot undermine the presumption of prospective application. That presumption "is *only strengthened* by the insertion of an effective date clause that explicitly mandates prospective application." *Summers*, 208 P.3d at 257 (emphasis added). In the absence of such a clause, the presumption would still exist, unless and until the General Assembly expressed an intent to apply the enactment retroactively, *Riley*, 828 P.2d at 257.

¶ 70 Because no intent to apply the 2013 legislation retroactively is suggested from its language, the presumption of prospective application applies. Thus, I would hold that the 2013 legislation did not retroactively re-classify the felony level of defendant's 2012 criminal conduct. *See* § 2-4-303, C.R.S. 2015 ("The repeal, revision, amendment, or consolidation of any statute . . . or section . . . shall not have the effect to release, extinguish, alter, modify, or change in whole or in part any penalty . . . either civil or criminal

. . . *unless* the repealing, revising, amending, or consolidating act so *expressly* provides . . . .") (emphasis added).